NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11914

COMMONWEALTH  vs.  ADERITO P. AMADO.

Plymouth.     December 8, 2015. - April 19, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.

Controlled Substances.  Search and Seizure, Protective frisk,
     Probable cause, Body examination.  Constitutional Law,
     Search and seizure, Probable cause.  Probable Cause.
     Practice, Criminal, Motion to suppress.

Indictment found and returned in the Superior Court
Department on July 18, 2011.

A pretrial motion to suppress evidence was heard by
Frank M. Gaziano, J., and the case was tried before Merita A.
Hopkins, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

Susan E. Taylor for the defendant.
Mary E. Lee, Assistant District Attorney, for the
Commonwealth.

HINES, J.  After a jury trial, the defendant, Aderito

Amado, was convicted of trafficking in fourteen grams or more of

cocaine, in violation of G. L. c. 94C, § 32E (b).  The Appeals Court affirmed the conviction in an unpublished memorandum and order issued pursuant to its rule 1:28.  We granted the defendant's application for further appellate review to consider whether the search of the defendant's genital area during a patfrisk for weapons was a strip search and, if so, whether it satisfied the probable cause requirement articulated in Commonwealth v. Morales, 462 Mass. 334, 342 (2012).  We conclude that although the police properly initiated the motor vehicle stop, the subsequent search, which involved pulling the defendant's clothing away from his body, shining a flashlight inside the clothing, and removing an object from his buttocks, was an unlawful strip search on two grounds.  First, the search of the defendant's buttocks area exceeded the permissible scope of a patfrisk for weapons where it occurred after the police had dispelled the safety concerns prompting the exit order and patfrisk.  Second, the search met the criteria of a strip search as we have defined it, and the search was unlawful because the police lacked probable cause to believe the defendant was concealing drugs on his person and it was otherwise unreasonable.  Thus, the judge erred in denying the motion to suppress the evidence obtained during the search.  We reverse the denial of the motion to suppress and remand the matter to the Superior Court for further proceedings.

1.  Motion to suppress.  a.  Background.  On June 2, 2011, at approximately 9:40 P.M., four officers of the Brockton police department were on patrol on North Main Street, driving in an unmarked vehicle.  They observed a green Acura automobile pulling out of a nearby gasoline station.  At least one of the officers recognized the defendant as the front seat passenger and recalled that he had been arrested a few weeks earlier for unlawful possession of a firearm.[1]  The police made a U-turn in the gasoline station and followed the automobile.  One of the officers noticed that the registration plate was not properly affixed.  The driver of the automobile made two quick turns in what appeared to be an effort to avoid police scrutiny.  The police activated their blue lights and pulled over the automobile.  All four of the police officers got out of their vehicle and approached the automobile with two officers on each side.  As the police officers approached, one of them observed the defendant reach his left arm behind his body.  One of the officers, Detective George Almeida, alerted the others, stating, "We got movement up front."  A second officer observed the defendant bring his left arm back down to the front of his body.

One of the police officers requested a driver's license and registration from the operator of the automobile; another

---

[1]  Aderito Amado had been arrested after the police searched a vehicle and found a handgun near the passenger seat where he was sitting.

illuminated the passenger compartment with his flashlight. The officers noted that despite "open[]" and "engag[ing]" communications in the past, the defendant on this occasion was extremely nervous; he avoided eye contact, his hands trembled, and he was breathing rapidly. Concerned for his safety, Detective Brian Donahue ordered the defendant out of the automobile. As the defendant emerged, Donahue did not observe any bulges or protrusions in the defendant's clothing suggesting a weapon. Donahue then conducted a patfrisk, felt what he surmised to be a roll of cash in the defendant's front pocket, and asked for the amount. The defendant responded that the roll contained $500 in cash. When Donahue continued the patfrisk by running his hand up the defendant's inner thigh, he felt an object behind the defendant's testicles. Based on its shape and feel, Detective Donahue did not suspect that the object was a gun. He called out to the other officers that the defendant was "jocking" something.[2] The defendant continuously denied carrying anything. Another officer pulled back the waistband of the defendant's shorts and underwear to view his bare backside. The detectives observed a plastic bag protruding from the defendant's buttocks. At the sight of the bag, the police handcuffed the defendant who declined to remove the bag himself.

---

[2] "Jocking" refers to a suspect's attempt to hide narcotics in the buttocks area.

A police supervisor arrived, and he and Donahue took the defendant between two nearby buildings, where they once again pulled out the defendant's shorts and underwear, this time shining a flashlight on his bare buttocks. The contents of the bag were not visible, but the officers ascertained that the bag was not inside the defendant's rectum. The police supervisor pulled the bag out from the defendant's buttocks. The drug laboratory later determined that the bag contained approximately twenty-four grams of "crack" cocaine.

The defendant filed a pretrial motion to suppress the plastic bag and its contents, claiming that the police (1) illegally stopped the automobile, (2) lacked adequate grounds to issue an exit order, and (3) improperly searched his person. After a hearing, the judge denied the defendant's motion to suppress the bag and its contents, ruling that (1) the police had the authority to stop the automobile based on the defective registration plate light; (2) the exit order was justified by safety concerns, including the high crime area of the stop as well as the defendant's recent arrest and movements within the automobile; and (3) because the exposure of the defendant's buttocks did not occur while the defendant was naked, it was not a strip search under Commonwealth v. Prophete, 443 Mass. 548,

557 (2005).[3]  Rejecting the defendant's claims, the motion judge concluded that the police, "[h]aving lawfully discovered the highly incriminating plastic baggies, . . . possessed probable cause to believe that it contained narcotics and to seize the narcotics in a noninvasive manner."

The defendant reprises the argument he made in his motion to suppress the narcotics, namely that the exit order following a civil motor vehicle infraction and a patfrisk reaching his testicles were unreasonable.  He maintains that after the patfrisk, the police conducted a strip search without probable cause.  The Commonwealth counters that the defendant waived his objections to the exit order and patfrisk because he did not pursue these issues in the Appeals Court.  Instead, the Commonwealth urges this court to limit the inquiry to a determination whether pulling the defendant's shorts and underwear away from his body constituted a strip search under Morales, 462 Mass. at 342, and argues that the search was not a strip search or, in the alternative, that the search was reasonable because it was conducted away from the road and only the officers viewed the defendant's bare skin.

---

[3] We have since determined that a strip search occurs when the last layer of clothing is moved -- not necessarily removed -- to expose an intimate area.  See Commonwealth v. Morales, 462 Mass. 334, 342 (2012).  The judge did not have the benefit of this decision at the time of his ruling on the motion to suppress.

b. Discussion. As an initial matter, we agree that the defendant failed to assert a specific challenge to the validity of the exit order and the scope of the patfrisk in the Appeals Court. Nonetheless, we address the issues as our authority to do so is derived from two principles of appellate review. First, an inquiry into the propriety of the exit order and the scope of the protective search is appropriate and necessary. The justification for the exit order necessarily is relevant to and constrains the scope of the subsequent patfrisk and the ensuing body search. Commonwealth v. Silva, 366 Mass. 402, 407 (1974), quoting Terry v. Ohio, 392 U.S. 1, 19 (1968) ("search must be 'strictly tied to and justified by the circumstances which rendered its initiation permissible'"). Second, where an issue is raised below, we review claims for error creating a substantial risk of a miscarriage of justice. See Commonwealth v. Arzola, 470 Mass. 809, 814 (2015), cert. denied, 136 S. Ct. 792 (2016). Thus, we now review both claims as a necessary predicate to our determination of the central issue underlying this appeal: whether the search of the defendant's buttocks area was reasonable.

"In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given . . . testimony presented

at the motion hearing" (citation omitted).  Commonwealth v. Wilson, 441 Mass. 390, 393 (2004).  "We review independently the application of constitutional principles to the facts found." Id.

i.  The stop.  "Where the police have observed a traffic violation, they are warranted in stopping a vehicle." Commonwealth v. Santana, 420 Mass. 205, 207 (1995), quoting Commonwealth v. Bacon, 381 Mass. 642, 644 (1980).  The stop of the vehicle cannot last "longer than reasonably necessary to effectuate the purpose of the stop" (citation omitted). Commonwealth v. Cruz, 459 Mass. 459, 465 (2011).  Here, the officers initially pursued the automobile because they identified the defendant as a passenger and wanted to investigate further based on his prior arrest for possession of a firearm.  During the pursuit, it happened that the police developed a proper basis for the stop once they noticed the vehicle's unlit registration plate.  Notwithstanding the pretextual basis for the stop, our law validates such police conduct so long as it is justified on independent grounds.[4]  See

---

[4] Such stops, though lawful under our current jurisprudence, implicate important policy concerns about racial profiling in encounters between the police and persons of color.  We leave to another day consideration whether and how police authority should be limited when a stop is clearly pretextual.

Santana, supra at 209 (vehicle stops reviewed under police authority not pretext).

ii. Exit order and patfrisk. Although exit orders issued to passengers during a routine traffic stop are permitted by the Fourth Amendment to the United States Constitution, Maryland v. Wilson, 519 U.S. 408, 415 (1997), art. 14 of the Massachusetts Declaration of the Rights offers greater protection to passengers. Commonwealth v. Gonsalves, 429 Mass. 658, 660-661, 668 (1999).[5] There are three situations in which police officers may properly order a passenger from a validly stopped vehicle. First, an exit order is proper when "a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger." Cruz, 459 Mass. at 466, quoting Gonsalves, supra at 661. Second, an exit order is proper if the officer developed a reasonable suspicion based on specific and articulable facts

---

[5] It is in this context that the defendant complains that he was ordered from the vehicle "one minute" after the officers requested the driver's license and registration. The defendant suggests that the rapidity of the exit order undermines its validity, but our cases have held that it is prolonged stops that often exceed police authority. See Commonwealth v. Torres, 424 Mass. 153, 163 (1997) (continued detention of driver and passenger impermissible where driver had produced license and registration in satisfaction of the purpose of the stop). But see Commonwealth v. Ciaramitaro, 51 Mass. App. Ct. 638, 643-644 (2001) (continued detention of driver leading to plain view observation of illegal weapons was permissible while awaiting results of license and registration inquiry). Regardless, the underlying issue remains the initiation and scope of the defendant's search.

that the passenger was engaged in, or about to engage in, criminal activity apart from any offense committed by the driver. Commonwealth v. Torres, 424 Mass. 153, 158-159 (1997). Third, an exit order is proper where the police are conducting a search of the automobile on other grounds, such as the automobile exception to the warrant requirement. Id. at 157.

Here, the motion judge articulated a confluence of factors justifying an exit order based on safety: the defendant's recent arrest for being in an automobile with an unlawful firearm; the defendant's arm movements behind his back and then forward again as the officers approached the automobile; the defendant's lack of eye contact with Detective Donahue; the defendant's rapid breathing; and the high crime area of the stop. We discern no basis on which to disturb the judge's factual findings or ruling that the exit order based on safety concerns was justified. See Wilson, 441 Mass. at 393. Accordingly, we turn to whether the scope of the subsequent protective search was justified. See Commonwealth v. Torres, 433 Mass. 669, 675-676 (2001).

"The scope of a Terry search cannot be general; rather, it is strictly tied to the circumstances that render its initiation permissible." Wilson, 441 Mass. at 396, citing Commonwealth v. Johnson, 413 Mass. 598, 601 (1992). Where an officer has issued an exit order based on safety concerns, the officer may conduct

a reasonable search for weapons in the absence of probable cause to arrest. Terry v. Ohio, 392 U.S. at 25-26. Such protective searches are reasonable if "confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered." Commonwealth v. Almeida, 373 Mass. 266, 272 (1977). See Silva, 366 Mass. at 407-408. "In most instances the search must be confined to a pat-down of the outer clothing of the suspect." Id. at 408. However, under the "plain feel" doctrine, an officer may seize contraband discovered during a Terry-type frisk if the officer feels an object whose contour or mass makes its identity immediately known. Wilson, supra at 396-397, citing Minnesota v. Dickerson, 508 U.S. 366, 373, 375-377 (1993).

Here, the officer did not see any protrusions or suspicious bulges in the defendant's athletic shorts. When the officer pat frisked the defendant, he felt an object behind the defendant's testicles that he knew was not a weapon.[6] At this point, the safety exigency justifying a search of the defendant's person ended as there was no remaining suspicion that the defendant possessed a weapon. Silva, 366 Mass. at 408 ("Only after the

---

[6] The Commonwealth asserts that the testicles and surrounding area cannot be declared search-free zones because small weapons can be hidden in the groin region. There is no need to make such a declaration here, and such a declaration would be inapplicable, because the officer knew the bulge was not a weapon.

pat-down gives indication that a weapon is present do the police have the privilege to search further").  Cf. Commonwealth v. Blevines, 438 Mass. 604, 608 (2003) (officer justified in retrieving "hard object" felt during patfrisk to dispel concern it was weapon).

Nor was a further search warranted under the "plain feel" doctrine, because the officer was unable to identify the contraband nature of the object by touch alone.  Wilson, 441 Mass. at 397 ("plain feel" doctrine prohibits general exploratory search where contraband not immediately apparent on touch).  Although the presence of an object behind the defendant's testicles was certainly suspicious, and it may have justified additional investigation, any further searches of the defendant's person required probable cause that the defendant was committing an offense.  See Morales, 462 Mass. at 339.

iii.  The strip search.  In Morales, 462 Mass. at 342, we determined that a strip search occurs "when a detainee remains partially clothed, but in circumstances during which a last layer of clothing is moved (and not necessarily removed) in such a manner whereby an intimate area of the detainee is viewed, exposed, or displayed."  Morales, which was decided after the motion to suppress hearing in this case, see note 3, supra, clarified the existing "definition of a strip search as one in which a detainee is commanded to remove the last layer of his or

her clothing." Prophete, 443 Mass. at 557. In Morales, we explained that, although complete nakedness was a determining factor in the strip search at issue in Prophete, total undress is not necessary to effect a strip search. Morales, supra.

Here, the trial judge did not address whether the initial pulling back of the defendant's clothing during the patfrisk was a strip search. The Appeals Court assumed, without deciding, that it was a strip search requiring probable cause. As no evidence was confiscated from this initial search, we do not address the matter. However, the second pulling back of the defendant's clothing was different; it constituted a strip search. In this case, when the police supervisor and the arresting officer opened the waistband of the defendant's underwear, exposed his bare skin, directed a flashlight on the area, and then retrieved the object, the defendant's private area was both viewed and exposed. In these circumstances, the police conducted a strip search within the meaning of Morales. 462 Mass. at 342. We next determine whether probable cause existed to justify the strip search.

Although the United States Supreme Court requires only reasonable suspicion to initiate strip searches under the Fourth Amendment, we have concluded that "probable cause is the appropriate standard that must be met for a strip or visual body cavity search to be constitutionally permissible" under art. 14.

Prophete, 441 Mass. at 553, citing Commonwealth v. Thomas, 429 Mass. 403, 407-408 (1999). This is so because strip searches "by their very nature are humiliating, demeaning, and terrifying experiences that, without question, constitute a substantial intrusion on one's personal privacy rights." Morales, 462 Mass. at 339-340, quoting Prophete, supra. Such searches may precede formal arrest as long as probable cause existed at the time the search was made, independent of the results of the search. Commonwealth v. Clermy, 421 Mass. 325, 330 (1995), citing Johnson, 413 Mass. at 602.

Here, the trial judge found that the police developed probable cause to arrest the defendant for a narcotics violation during the patfrisk. As a result, the strip search was deemed a search incident to arrest for a suspected drug offense. In urging us to uphold these determinations, the Commonwealth points to the Clermy case, where a defendant was arrested on an outstanding motor vehicle warrant while sitting on the steps of a known "crack" house in an area of high arrest rates for narcotics violations. 421 Mass. at 326. After the patfrisk revealed a paging device and sixty dollars in cash, the police placed the defendant in a cruiser and conducted a second safety search, which revealed a hard object in his genital area. Id. at 327. The police retrieved a plastic prescription bottle containing twenty-five pieces of "crack" cocaine. Id. On

review, this court concluded that "[i]t is eminently reasonable to infer that a prescription bottle carried in this manner would contain contraband, and, most probably, a controlled substance." Id. at 330-331.

Although probable cause may develop during a patfrisk, that was not the case here. The arresting officer knew the object was not a weapon but only suspected it was contraband, based on his experience finding drugs concealed in the genital area. Other than a suspicious but unknown object, there existed no indication that the defendant was committing or about to commit a drug offense. The defendant's arm movements and nervousness prompted the protective patfrisk but suggested no connection to suspected narcotics. He was ordered out of an automobile stopped for a minor motor vehicle infraction, but not for suspected drug activity. He was not the driver of the vehicle, nor was there concern about operating while under the influence. In addition, his clothing showed no visual clues indicating the presence of narcotics on his person. Last, the vicinity of the stop was not identified as an area known for drug trafficking. In sum, the police officer's reasonable suspicion could not have ripened into probable cause without the additional and impermissible searching of the defendant's person that occurred here. See Wilson, 441 Mass. at 396, citing Dickerson, 508 U.S. at 378-379 ("If the officer must manipulate or otherwise further

physically explore the concealed object in order to discern its identity, then an unconstitutional search has occurred").  The facts here placed the defendant in a probable cause "no man's land" as far as the police were concerned, where the police had reasonable suspicion to believe the defendant was engaged in something illegal but did not have probable cause to believe that the suspected illegal activity involved a drug offense.

The dissent posits that the police had probable cause to believe that the defendant was "'jocking' illegal drugs" essentially because "when a police officer feels a foreign object in a male's groin or buttocks area, it is reasonable inference that the object contains illegal drugs."  Post at    . According to the dissent, that inference "grows stronger still where the defendant twice denies that he is hiding anything, even though it is plain that he is."  Id. at    .  The specific facts cited by the dissent in support of probable cause, of course, are highly suspicious.  However, what was required here was that the information known to the police at the time of the search connected the defendant to possession of illegal drugs, the offense for which probable cause must be established.  Where the defendant is a passenger in a vehicle stopped on pretextual grounds to investigate the defendant because of his past arrest for possession of a firearm, that connection is missing. Furthermore, that connection cannot be established by the police

officer's experience with other detainees who in the past may have secreted contraband in the groin area. That experience, without information particular to the defendant's involvement with contraband, did not transform the random encounter into probable cause to believe this defendant was committing a drug offense. There is no doubt that a denial, especially an absurd one, may heighten an officer's suspicion. Yet heightened suspicion is not probable cause, and we have rejected the proposition that the police require only reasonable suspicion before conducting a strip search. Thomas, 429 Mass. at 408.

Even where probable cause for a strip search exists, the search must also be reasonably conducted. Morales, 462 Mass. at 342. Reasonableness is not a fixed concept. Rather it is determined by considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Thomas, 429 Mass. at 407, quoting Bell v. Wolfish, 441 U.S. 520, 559 (1979). See Bell, supra at 558 (finding visual body cavity searches of inmates constitutional). In Morales we determined that the unconsented-to police observation and the public exposure of the defendant's intimate areas was unreasonable as "a significant intrusion of the defendant's privacy." 462 Mass. at 341. The search in this case failed to meet the test of reasonableness for the same reason as in

Morales. That is, the police conducted the search of the defendant in a public location. Id. The attempt to mitigate the public exposure by taking the defendant between two buildings to remove the bag from his genital area did not render the search private where any number of persons could have observed the encounter.

The dissent challenges our view of the reasonableness of the search, asserting that "[t]his is a far cry from the strip search in the Morales case [462 Mass. at 338] where the defendant was seen 'lying face down on the sidewalk with his buttocks exposed.'" Post at   . The distinction is that the defendant's "buttocks and groin area were not exposed to any passerby," and the officers attempted "to obtain greater privacy." Id. at   . The operative fact in Morales was the public nature of what we deemed to be a strip search. That is precisely what happened here, and reasonableness is not established just because, as the dissent puts it, "[t]here is no reason to believe that . . . anyone other than the searching detectives could have seen the defendant's buttocks or groin." Post at   . On the record before us, that fact is speculative. Indeed, the "humiliating, demeaning, and terrifying experience[]," Morales, supra at 339-340, quoting Prophete, 441 Mass. at 553, that is the hallmark of a strip search exists even where the arresting officers are the only persons to view a

suspect's intimate areas.  Thus, where the safety exigency had ended and the search could have been observed from the surrounding residential units, we are persuaded that the search was not reasonable in these circumstances.

Conclusion.  We conclude that the body search of the defendant constituted a strip search, that the police lacked probable cause to justify the search, and that it was unreasonable in the circumstances.  Accordingly, the motion to suppress the contents of the bag retrieved during the strip search should have been allowed.  We therefore vacate the judgment of conviction and remand the matter to the Superior Court for further proceedings consistent with this opinion.

So ordered.

GANTS, C.J. (dissenting, with whom Spina and Cordy, JJ., join). I agree with the court regarding the law. The pulling back of the defendant's waistband, first to observe the object that the defendant was "jocking," and later to retrieve it, were strip searches under our law. See Commonwealth v. Morales, 462 Mass. 334, 342 (2012) ("A strip search . . . may occur when a detainee remains partially clothed, but in circumstances during which a last layer of clothing is moved (and not necessarily removed) in such a manner whereby an intimate area of the detainee is viewed, exposed, or displayed"). Probable cause was needed to conduct these strip searches. See id. at 339, quoting Commonwealth v. Prophete, 443 Mass. 548, 554 (2005) ("A search of a defendant 'lawfully could progressively extend into a strip (or a visual body cavity) search only if such a search was justified by probable cause to believe that the defendant had concealed [drugs] on his person or his clothing that would not otherwise be discovered by the usual search incident to arrest'"). And to pass constitutional muster, the strip searches must have been reasonably conducted under the circumstances. See Morales, supra at 342 ("For a visual body cavity search and a strip search to be constitutional under the Fourth Amendment [to the United States Constitution] and art. 14 [of the Massachusetts Declaration of Rights], such searches also must be reasonably conducted").

I dissent because I disagree with the court's application of the law to these facts. Based on the factual findings of the motion judge, which were not clearly erroneous, there was probable cause to believe that the defendant was "jocking" illegal drugs, and it was reasonable under the circumstances to pull the waistband of his shorts back to observe and later retrieve the plastic bag containing the drugs, because the only persons who could observe the defendant's buttocks and groin area in such a strip search were the detectives who conducted it. See id. at 343.

1. Probable cause for the search. Based on the judge's findings, when Brockton police Detective Eric Hilliard pulled back the defendant's waistband to look for drugs, the following information was known to the police:

- As the detectives approached the vehicle in which the defendant was a passenger, the defendant was seen reaching his left arm behind his body.

- When Detective Brian Donahue approached the vehicle, the defendant appeared "extremely nervous -- he stared straight ahead seeking to avoid eye contact, his hands trembled, his chest heaved, and he was breathing rapidly." The defendant's demeanor was different from previous encounters Detective Donahue had with the defendant, where the defendant was "engaging" and "spoke openly."

- The defendant had a wad of $500 in cash in his front pocket.

- When Detective Donahue conducted a frisk of the defendant's inner thighs and crotch area, he felt a hard object behind the defendant's testicles that he knew was not "part of the male anatomy."

- When Detective Donahue asked the defendant what he was hiding there, the defendant twice denied hiding anything.

- Detective Donahue knew from his training and experience that drug dealers hide narcotics in the buttocks area, and had recovered narcotics hidden in that manner from drug dealers before. He referred to this practice as "jocking something."

Courts inside and outside of Massachusetts have recognized that, when a police officer feels a foreign object in a male's groin or buttocks area, it is a reasonable inference that the object contains illegal drugs. See Commonwealth v. Clermy, 421 Mass. 325, 327, 330-331 (1995) ("It is eminently reasonable to infer that a prescription bottle carried [between the defendant's legs in the area of his genitals] would contain contraband, and, most probably, a controlled substance"); United States v. Walker, 181 F.3d 774, 779 (6th Cir.), cert. denied, 528 U.S. 980 (1999) (seizure of plastic bag justified where police officer felt bulge under suspect's pants while pat

frisking groin and buttocks); People v. Champion, 452 Mich. 92, 111-112 (1996), cert. denied, 519 U.S. 1081 (1997) (probable cause to believe that pill bottle contained contraband where police discovered bottle in defendant's groin region). See also 2 W.R. LaFave, Search and Seizure § 3.6(b), at 403-404 (5th ed. 2012) ("If the package is concealed in the groin area, a finding of probable cause is much more likely. And even if the touching does not alone supply probable cause, it may contribute together with other facts to a probable cause finding" [footnotes omitted]).

This inference grows stronger where the officer has found narcotics hidden in that manner before and knows from his or her training and experience that drug dealers hide narcotics there. See United States v. Ashley, 37 F.3d 678, 681 (D.C. Cir. 1994), cert. denied, 513 U.S. 1181 (1995) (probable cause where officer felt object in groin area during patfrisk and officer testified that he had previously found narcotics hidden in that area of the body).

This inference grows stronger still where the defendant twice denies that he is hiding anything, even though it is plain that he is. See Commonwealth v. Gentile, 437 Mass. 569, 574 (2002) ("inconsistent, false, [and] implausible" statements by defendant to police contributed to finding of probable cause). See also United States v. Ilazi, 730 F.2d 1120, 1127

(8th Cir. 1984) (along with other suspicious circumstances, defendant's failure to explain unusual bulge in boot constituted probable cause to arrest for narcotics offense).

The discovery that the defendant was "jocking something" and his false denial that he was hiding anything gave incriminating meaning to the earlier observation of the defendant reaching his left arm behind his body, which is consistent with his placement of something in his buttocks under his loose fitting athletic shorts. It also gave incriminating meaning to the defendant's demeanor with Detective Donahue, which was different from prior encounters.

I recognize that, before this encounter, there was no information that the defendant dealt or used controlled substances. But such information would simply have gilded the lily of probable cause. There was abundant probable cause without this information. After all, if the object did not contain contraband, why would a person keep it in his buttocks and then, when it was felt by a police officer during a patfrisk, deny its very existence?[1]

---

[1] I also recognize that this is the most pretextual of stops: the detectives were looking for a legal justification to stop the vehicle, and found it when they saw that the license plate was not properly illuminated. But even if we were, for this reason, to apply heightened scrutiny to our probable cause analysis, the facts here survive such scrutiny.

2. <u>Reasonableness of the strip search</u>. In evaluating the reasonableness of a strip search, "[h]ow a search is conducted is of the utmost importance, with the least amount of intrusion constituting the better practice." <u>Morales</u>, 462 Mass. at 343. Here, the defendant's clothing was not removed, and his buttocks and groin area were not exposed to any passerby who might observe the search. Rather, the searches in this case were strip searches only because a detective lifted the waistband of the defendant's athletic shorts and underwear, thereby exposing his private parts to the detectives who conducted the search. There is no reason to believe that, in either search, anyone other than the searching detectives could have seen the defendant's buttocks or groin. During the second search, where the detectives retrieved the plastic bag from the defendant's buttocks, they moved to an alley between residential buildings in an effort to obtain greater privacy, but all they ultimately did was pull back the defendant's waistband again, this time perhaps a bit further. This is a far cry from the strip search in the <u>Morales</u> case where the defendant was seen "lying face down on the sidewalk with his buttocks exposed." See <u>id</u>. at 338. Certainly, if the police had taken the defendant to a private room to conduct a strip search, no one would question that it was conducted reasonably, because the only persons who would then see the defendant's

buttocks and groin would be the police officers conducting the strip search.  See id. at 342-343 ("Concerning the place where such a search is conducted, courts have indicated that, in order to preserve a detainee's privacy, a private room is preferable").  But the same is true here, because all that the searching detectives did was pull back the defendant's waistband, exposing his private areas only to the detectives who conducted the search.  Under these circumstances, I conclude that the strip searches were "perfectly reasonable in scope and manner and did not result in either the public disclosure of the defendant's buttocks or undue embarrassment or humiliation."  See id. at 345 (Cordy, J., concurring).

3.  Conclusion.  Because I conclude that there was probable cause to believe that the defendant was "jocking" illegal drugs, and that the conduct and manner of the strip searches to observe and later retrieve the plastic bag containing the drugs were reasonable under the circumstances, I would affirm the motion judge's denial of the defendant's motion to suppress. Therefore, I respectfully dissent.